UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TANJA KOVACEVIC,

    Plaintiff,

v.

AMERICAN INTERNATIONAL FOODS, INC.,

    Defendant.
_____/

Case No. 1:21-cv-72

Hon. Hala Y. Jarbou

## OPINION

Plaintiff Tanja Kovacevic brings this action against her former employer, American International Foods, Inc. ("AIF"), under the Families First Coronavirus Response Act (FFCRA), 29 U.S.C. § 2601 et seq., the Emergency Paid Sick Leave Act of 2020 (EPSLA), which was part of the FFCRA, and Michigan's COVID-19 Employment Rights Act of 2020 (CERA), Mich. Comp. Laws § 419.401 et seq. Before the Court is AIF's motion for summary judgment (ECF No. 62). For the reasons herein, the Court will grant the motion as to Kovacevic's EPSLA claim. The Court will decline to exercise jurisdiction over the CERA claim and dismiss the case.

### I. BACKGROUND

The following is a summary of the facts in the record, viewing the evidence in a light most favorable to Kovacevic.

Kovacevic began her employment with AIF on January 27, 2020, working in its accounting department as an Accounts Payable Specialist. (Kovacevic Dep. 142, ECF No. 63-25.)[1] In that role, she was responsible for processing bills from, and payments to, AIF's vendors. (Goldberg

---

[1] Excerpts of Kovacevic's deposition transcript are also available at ECF Nos. 66-1 and 68-1.

Decl. ¶ 6, ECF No. 63-1.)  Her duties required her to "reconcil[e] invoiced amounts with purchase orders, discounts, and credits" so that AIF could "issue accurate checks[.]"  (*Id.*)  And she had to "monitor the AP@americaninternationalfoods.com email account and respond to all requests for status of payments, short pays, or discrepancies to resolve all outstanding accounts payable items." (*Id.*)

There was a total of three employees in the accounting department.  Scott Goldberg, AIF's Chief Financial Officer, was her supervisor.  Another employee handled accounts receivable. (Kovacevic Dep. 49.)

### A. Kovacevic's Performance

According to Goldberg, Kovacevic struggled in her role.  "At nearly every check run, three times a week," she brought him checks that contained "some form of mistake," such as a check drawn for the wrong amount or for an invoice that was not yet due.  (Goldberg Decl. ¶ 9.)  These mistakes required AIF to "void[] and reprint[] the related check."  (*Id.*)  There were some issues with accounts payable before Kovacevic started, including "[v]endors who should have been paid but weren't paid or vendors who checks were written for that shouldn't have been written[.]" (Goldberg Dep. 55-56, ECF No. 66-3.)[2]  But 2020 was different.  That year, AIF experienced a "952% increase in voided checks over prior years."  (Goldberg Decl. ¶ 10.)

Kovacevic acknowledges making some mistakes, though she does not believe that she made "a lot" of mistakes, or enough that would be sufficient to terminate her.  (*See* Kovacevic Dep. 67-69.)  She does not specifically contest Goldberg's assertions about the number of voided checks in 2020 compared to prior years.  But she contends that both she and Goldberg voided checks.  (*Id.* at 77.)

---

[2] Excerpts of Goldberg's deposition transcript are also available at ECF Nos. 63-26 and 68-2.

2

AIF employee Ashley Benton also experienced difficulties working with Kovacevic. Benton was not part of the accounting department. She received incoming mail for AIF. (Benton Decl. ¶ 5, ECF No. 63-7.) One of her duties was to "match invoices with purchase orders as invoices come in and make a notation in QuickBooks cross-referencing the invoice number with the correct purchase order(s)." (*Id.*) In March 2020, almost two months after Kovacevic had started, Benton complained to Goldberg that Kovacevic was asking Benton "every day to search for invoices [in QuickBooks] rather than look for them herself." (*Id.* ¶ 4.) Goldberg responded to Benton's concern by telling Kovacevic that she could find the status of bills herself by searching for the appropriate purchase order in QuickBooks. (3/25/2020 Goldberg Email, ECF No. 63-6, PageID.300.) He explained that "Ashley is going to be pulled in different directions," so Kovacevic should "come to [him] if [she] can't find something so [he] could train [her] on how to search for it independently." (*Id.*)

A few days later, Goldberg brought up another issue. He told Kovacevic to "make sure you are filing after every check run. It is causing some issues by holding on to the payment records as people are needing to pull them for various requests." (3/30/2020 Goldberg Email, ECF No. 63-9, PageID.308.)

In May 2020, Benton informed Goldberg that Kovacevic was "still having trouble looking up invoices by purchase order number within QuickBooks on her own." (Benton Decl. ¶ 5.) So Goldberg asked Benton to train Kovacevic on how to match invoices with purchase orders. (*Id.* ¶ 7.) Benton tried to do so by inviting Kovacevic to training sessions on two days a week for half an hour each. (*Id.* ¶ 8.) But to Benton, Kovacevic did not seem interested in training. She "kept cancelling or rescheduling" their meetings. (*Id.* ¶ 9.) And she would say, "I already know this" or she would "get argumentative." (*Id.*) Benton reported this to Goldberg. (Goldberg Decl. ¶ 16.)

3

Four months later, Kovacevic was still asking Benton to look up invoices for her. (Benton Decl. ¶ 10.)

Other issues cropped up that summer and fall. At the end of August 2020, Goldberg presented Kovacevic with $260,000.00 worth of checks printed for bills that were not yet due. (Kovacevic Dep. 70.) He admonished her to "double and triple check, [that] due dates, amounts in [QuickBooks] match the invoice – prior to cutting the check, and all invoices on the check are included in the payment package." (8/31/2020 Goldberg Email, ECF No. 63-12, PageID.315.) He explained that there are "financial implications to paying these bills so early, especially when the dollar amount is so large, when they are not yet due and we cannot have these errors continue to happen." (*Id.*) He told her to ask him if she had a question about "how to do something" and to "re-focus on this and develop your own internal process/controls/system to make sure you are catching these errors before you cut the check and before giving me to sign." (*Id.*)

Kovacevic acknowledges that these checks were printed in error. (Kovacevic Dep. 73, 75.) She attributes her mistakes to the fact that she was relying on due dates entered in QuickBooks rather than the due dates on the invoices. (*Id.* at 73.) But at the same time, she testified that her role required her to "mak[e] sure that the invoice itself matches what [is in] QuickBooks[.]" (*Id.*)

In September 2020, Goldberg emailed Kovacevic about errors that she had created in the QuickBooks system by "adding a minus one to the invoice number when the vendor says we owe them more money." (*Id.* at 97.) He explained to her that "[t]his is not the correct process and causes errors not only in payment, but in our system." (*Id.*) Kovacevic does not recall why she entered bills in this manner. (*Id.*)

That same month, Goldberg asked Kovacevic about her "process for payment holds" because she had given him a check for a vendor that "brings us below the amount of bills Tom

4

[Michele]³ asked us to hold." (10/13/2020 Goldberg Email, ECF No. 63-14, PageID.319.) She responded that the vendor told her that there were $26,000 in outstanding invoices; the check was for $9,000, so that left $17,000 on hold, above the $10,000 amount Michele had instructed them "not to go below." (*Id.*) Goldberg replied that Michele had asked them "not to get below" $18,000, "per his email on 9/17," and that Goldberg was "concerned [she] was listening to the vendor on what is due and not verifying, comparing [AIF's] records and overruling what Tom said." (*Id.*)

### B. AIF Considers Replacing Kovacevic

According to Goldberg, in mid-August 2020, he had a discussion with AIF's Human Resources Manager, Robert Barber, about the possibility of terminating Kovacevic. (Goldberg Dep. 73.) He told Barber that Kovacevic's "work mistakes were not getting better and it was at the point that [he] believe[d] [he] needed to find a replacement." (*Id.*)

There is no evidence that Barber was aware of Goldberg's concerns before their meeting, but at some point, Barber told Kovacevic that she was "the best employee [AIF] had, because [she] was always so happy at work." (Kovacevic Aff. ¶ 11, ECF No. 66-2.) And Kovacevic avers that no one at AIF warned her that she needed to improve her performance "to keep [her] job," or that her "job performance put [her] in jeopardy of possible termination." (*Id.* ¶¶ 8-9.)

In October, Goldberg asked Barber to put a posting for Kovacevic's position on the job listings website Indeed.com. (Goldberg Decl. ¶ 18.) Barber did so on October 20, 2020. (Barber Decl. ¶ 6, ECF No. 63-16; *see* Indeed.com Job Posting, ECF No.63-15, PageID.321.) "Within a week," Barber "began reviewing applications submitted . . . and contacting potential candidates to schedule interviews." (*Id.* ¶ 7.) He contacted at least three candidates, asking for copies of their resumes. (*Id.* ¶ 8; *see* Barber Emails, ECF Nos. 63-17, 63-18, PageID.326-331.)

---

³ Michele was AIF's Director of Operations.

5

**C. Kovacevic Takes COVID leave**

During the COVID-19 pandemic, AIF adopted a rule that, by entering the building each day, its employees were making the following assertions:

- I do not have a fever of 100.4 or greater, nor have I in the past 72 hours.
- I do not have a severe cough that started in the last 48 hours.
- I am not experiencing shortness of breath.
- I do not have body aches.
- I have not vomited in the past 72 hours.
- I have not knowingly been exposed to someone that has been diagnosed with COVID-19.
- I have adhered to the State of Michigan "Shelter in Place" guidelines."

(Safety Measures, ECF No. 63-10, PageID.311.) If any of these statements were not true, then the employee was to report that information to their supervisor. (*Id.*) Kovacevic was aware of these rules. (Kovacevic Dep. 150.)

On Monday, November 16, 2020, Kovacevic reported to work and told Michele, who was at the front desk, that she had not felt well over the weekend. (Michele Dep. 28, ECF No. 63-28.) According to Kovacevic, she had been "shaking and freezing" in the middle of the night, but that morning she felt "perfectly fine." (Kovacevic Dep. 51.) Michele told her to go home and get tested for COVID. (Michele Dep. 28; Kovacevic Dep. 52, 63-64.) She went home and was able to take a COVID test two days later. (Kovacevic Dep. 52.) By then, she had lost her sense of taste and smell. (*Id.*) On Friday, November 20, she learned that she had tested positive for COVID-19, so she informed AIF. (*Id.* at 53.) AIF told her to stay home until she felt better, "after the 14 days that the [Michigan Governor] had announced."[4] (*Id.* at 53-54.)

---

[4] In context, Kovacevic appears to be referring to a period of 14 days after the onset of her symptoms.

**D. Goldberg Discovers Additional Issues with Kovacevic's Work**

While Kovacevic was out of the office, Goldberg took over her assigned tasks. When doing so, he discovered additional issues with Kovacevic's work, including: (1) "97 blank checks that were not used in sequence, hidden, and forgotten about"; (2) "[o]ver 70 past due bills [that] were found in stacks, in various places," and that were "past due from between two and five months"; (3) "[o]ver 70 vendor credits totaling more than $100,000, personally given to [Kovacevic], that were not processed and applied to vendor payments," dating back to "between March 2020 and September 2020"; and (4) a file cabinet of "approximately $2.5 million of active bills [that] were not organized and alphabetized by vendor and due date[.]" (Goldberg Decl. ¶ 27.)

Kovacevic contends that AIF raised these issues with her in August and September, before her leave of absence. (Pl.'s Br. 6, ECF No. 66.) But the evidence she relies upon does not support that assertion. She points to Goldberg's email in August about the $260,000 in checks for bills not yet due. She also points to an email from Goldberg in September in which he asked her to "make sure [she is] taking the blank checks out of the check printer nightly" and to tell him "where [she is] putting the blank ones in the office." (9/23/2020 Goldberg Email, ECF No. 63-13.) Neither of those emails addresses the issues identified by Goldberg in his declaration.

Goldberg avers that these newly discovered issues, considered together with Kovacevic's past performance, gave him concern that Kovacevic's work was "financially detrimental" to AIF and that it needed to terminate her "immediately instead of waiting for a replacement." (Goldberg Decl. ¶ 28.) He made the decision to terminate her. (Goldberg Dep. 21.)

**E. AIF Terminates Kovacevic**

By Tuesday, November 24, Kovacevic had recovered her sense of taste and smell. (Kovacevic Dep. 54-55.) She called AIF to let it know about her status. Barber told her to stay home until she felt better, after the Thanksgiving break on November 26 and 27. (*Id.*) She asked

7

him when she could return because the end of the 14-day period was approaching. Barber told her that "they needed to see what they're going to do with [her]" because she had COVID and they needed "to see what [they're] gonna do with employees that had COVID." (*Id.*) After ending the call with Barber, she received a call from Goldberg, who told her that "it's best for us to go separate ways." (*Id.* at 55.) She asked him why, and he reiterated that "it's better for us to separate at this point." (*Id.*) Barber sent her an email later that day with a termination letter signed by Goldberg. (11/24/2020 Barber Email & Termination Letter, ECF No. 66-11.)

After Goldberg's call with Kovacevic, Barber asked Goldberg and Michele for "additional documentation" to put into Kovacevic's employee file. (Barber Dep. 44.) Michele sent Barber and Goldberg an email highlighting some of her performance issues, including: (1) Kovacevic's failure to complete training on how to match invoices; (2) her apparent failure to heed Michele's instruction to hold payment for a particular vendor; (3) "several credits . . . in the system that were not being taken on vendors"; and (4) her apparent willingness to enter the building on November 16 despite that fact that she had not been feeling well. (11/24/2020 Michele Email #1, ECF No. 66-12.) Barber and Goldberg spoke with one another and then Barber sent Goldberg an email "document[ing]" their conversation. (*See* 11/24/2020 Barber Email to Goldberg, ECF No. 66-14.) Barber's email mentioned some of the performance issues discussed earlier in this Opinion, as well as the events preceding her termination. (*Id.*) Michele followed up with another email that described Kovacevic's apparent inability "to determine if things were past due or . . . to communicate it to the vendor in a clear way." (11/24/2020 Michele Email #2, ECF No. 66-15.) He described an instance in which a vendor asked "for several months to get paid and it was not resolved," such that the vendor was "going to shut [AIF's] account down." (*Id.*)

After Kovacevic's termination, AIF paid her through December 1, 2020. (Goldberg Decl. ¶ 30.)

## II. CLAIMS

Kovacevic asserts the following claims against AIF in her second amended complaint: (1) violating the EPSLA by terminating her for taking leave and refusing to reinstate her; and (2) violating the CERA by terminating her for testing positive for COVID-19 and for taking leave due to that test result. (*See* 2d Am. Compl., ECF No. 56.)

AIF seeks summary judgment on those claims.

## III. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## IV. ANALYSIS

### A. EPSLA

The EPSLA, which has expired, required certain employers to provide up to two weeks of paid sick leave for employees who are or may be infected with COVID-19. Specifically, the statute required such leave "to the extent that the employee is unable to work . . . due to a need for leave because: . . . (1) [t]he employee is subject to a Federal, State, or local quarantine or isolation order

9

related to COVID-19"; "(2) [t]he employee has been advised by a health care provider to self-quarantine due to concerns related to COVID-19"; or "(3) [t]he employee is experiencing symptoms of COVID-19 and seeking a medical diagnosis." EPSLA, Pub. L. No. 116-127, § 5102, 134 Stat. 195-96 (2020). The EPSLA also made it unlawful to "discharge, discipline, or in any other manner discriminate" against an employee who "[took] leave in accordance with this Act." *Id.* § 5104, 134 Stat. at 196-97.

In a previous opinion, this Court held that Kovacevic cannot state a claim for interference with a right to reinstatement under the EPSLA because that right does not exist. (8/17/2021 Op. 5-6, ECF No. 27.) Her remaining claim under that statute is that AIF violated the EPSLA's prohibitions on discharge, discipline, or discrimination for taking paid leave, "which is a retaliation theory of liability." (*Id.* at 6.) Because the EPSLA relies upon enforcement provisions in the Fair Labor Standards Act (FLSA), "it makes some sense to draw upon case law applying the FLSA" to adjudicate Kovacevic's EPLSA claim. (*See id.* at 8.)

Kovacevic does not rely on direct evidence of retaliation, so the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 782 (1973) applies to her claim. *See Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006) (applying *McDonnell Douglas* to a retaliation claim brought under the FLSA).

To establish a prima facie case of retaliation, Kovacevic must prove the following:

(1) [she] engaged in a protected activity under the [EPSLA]; (2) [her] exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action.

*Id.* A prima facie showing "'creates a presumption that the employer unlawfully discriminated against the employee.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).

If Kovacevic "establishes a prima facie case, the burden then shifts to [AIF] to set forth a legitimate, non-discriminatory reason for the adverse employment action." *Id.* "If [AIF] carries this burden, [Kovacevic] then must prove by a preponderance of the evidence that [AIF's] proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." *Id.*

### 1. Prima Facie Case

*Protected Conduct*. AIF argues that Kovacevic cannot establish a prima facie case because she did not engage in protected conduct. According to AIF, taking leave was not protected conduct because AIF paid Kovacevic for the eighty hours of leave to which she was entitled under the EPSLA. That argument does not follow. The EPSLA expressly prohibits employers from discriminating against employees for taking leave under that act. Thus, taking leave is the protected conduct. The employer's act of paying the employee for that leave does not change the protected nature of the employee's conduct. Indeed, under AIF's logic, an employer would violate the EPSLA only if it failed to *compensate* the employee for taking leave. But paying an employee for taking leave only satisfies the paid leave requirement. It does not exempt the employer from the requirement not to discriminate against the employee for taking the leave. An employer could pay an employee for taking leave and still discriminate against the employee for exercising that right to leave. Here, there is no dispute that Kovacevic took leave under the EPSLA, so she engaged in protected conduct.

*Causal Connection*. Next, AIF argues that Kovacevic has not shown a causal connection between her leave and its decision to terminate her. Here, she must "'produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken'" had she not taken leave. *Adair*, 452 F.3d at 490 (quoting *Allen v. Mich. Dep't of Corrs.*, 165 F.3d 405, 413 (6th Cir. 1999)). She has met that burden. As this Court noted in a prior opinion, "AIF terminated Kovacevic while she was still on leave. Such close temporal proximity between the

11

protected activity and the adverse action can be 'strong circumstantial evidence' of retaliation. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 350 (6th Cir. 2021)." (8/17/2021 Op. 8, ECF No. 27.)

AIF contends that there is no causal connection between Kovacevic's leave and her termination because it decided to terminate her *before* she took her leave. AIF points to Goldberg's discussion with Barber in August 2020 about finding a replacement and to Goldberg's request in October 2020 that Barber post a job listing for her position on Indeed.com. But that evidence does not conclusively establish that AIF had decided to terminate Kovacevic before she took her leave. For instance, Goldberg testified that he told Barber in August that he "*believe[d]* [he] needed to find a replacement." (Goldberg Dep. 73 (emphasis added).) This statement suggests that he was still considering what do to. Indeed, he apparently took no further action to replace or terminate Kovacevic until two months later, when he finally asked Barber to put up the job posting. In the meantime, he continued to work with her and provide her with feedback. He did not interview other candidates or offer them Kovacevic's position. He did not tell Barber or Kovacevic that he was terminating her. Also, in his declaration, he states that while Kovacevic was on leave, he decided to terminate her employment "*immediately* rather than wait for a replacement" due, in part, to errors that he discovered during her leave. (Goldberg Decl. ¶ 28 (emphasis added).) A jury could infer from all this evidence that Goldberg had decided to continue working with Kovacevic in spite of his concerns, and that he did not make a final decision about whether to terminate her until *after* she began her leave.

In *Arban v. West Publishing Corp.*, 345 F.3d 390 (6th Cir. 2003), the Court of Appeals considered a somewhat similar situation. There, the employer "presented considerable evidence that the decision to terminate [the plaintiff] had been made before [the plaintiff] went on medical

12

leave, but that his actual termination had been deferred until after the holidays." *Id.* at 401. Among other things, the decisionmaker told other managers that he was "open minded to an alternative [to termination] that [he] should reconsider[.]" *Id.* at 402. Around that same time, the employer prepared a document stating that the plaintiff "meets expectations in all areas." *Id.* (quotation marks omitted). And another email from shortly before the employee's leave discussed "events *to consider* in terminating" the employee. *Id.* (emphasis in original). In those circumstances, a jury could conclude that the employer "was continuing to study the matter and had not come to a final decision" by the time the plaintiff took his leave. *Id.* Similarly, a jury could conclude that the evidence here raises a genuine dispute of fact about whether Goldberg had reached a final decision to terminate Kovacevic before her leave of absence.

AIF relies on cases that are distinguishable. *See Graham v. Barrier Techs., LLC*, No. 20-61080-CIV-SINGHAL/VALLE, 2021 WL 2431052 (S.D. Fla. June 15, 2021); *Simone v. Harborview Rehab. & Care Ctr. at Doylestown, LLC*, No. 20-3551, 2021 WL 2291341 (E.D. Pa. June 4, 2021). In *Graham*, the person who made the decision to terminate the plaintiff was not aware of her protected conduct. *Graham*, 2021 WL 2431052, at *6. The same cannot be said of Goldberg.

In *Simone*, the employer took concrete steps to replace the plaintiff—including telling the plaintiff's supervisor that the plaintiff had resigned and offering another person the plaintiff's job—before the plaintiff took his leave. *Simone*, 2021 WL 2291341, at *2. AIF did not take such steps here. Also, the decisionmakers in *Graham* and *Simone* did not offer testimony like Goldberg's, implying that the final decision to terminate the employee occurred while the employee was on leave.

In short, Kovacevic's evidence is sufficient to support her prima facie case.

### 2. Pretext

AIF contends that it terminated Kovacevic due to her poor performance. There is no dispute that this sort of reason is a legitimate basis for terminating an employee. At issue, then, is whether AIF's asserted reason is a pretext for retaliation.

> Plaintiffs typically show pretext in one of three ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action."

*Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Kovacevic is "free to pursue arguments outside these three categories"; the "ultimate inquiry" is whether AIF fired Kovacevic for its stated reason. *Id.*

Kovacevic argues that AIF's proffered reason did not actually motivate its decision to terminate her. First, she points to the close temporal proximity between her leave and her termination. But while that proximity is relevant to her prima facie case, it "'cannot be the sole basis for finding pretext.'" *Seeger v. Cincinnatti Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)). And at any rate, that timing is not particularly suspicious in this case considering AIF's unrefuted evidence that, during Kovacevic's leave, Goldberg discovered additional issues that gave him reason to believe that she could not adequately perform her job responsibilities.

Next, Kovacevic notes that AIF did not counsel her or give her formal performance reviews before terminating her. She notes that her offer letter stated that she "will be expected to be involved in a 30, 60, 90 day, 6 month and annual [performance] reviews." (Letter, ECF No. 66-6, PageID.614.) Similarly, AIF's employee handbook stated:

> Individual job performance is reviewed on the following schedule:

> All new employees will be reviewed at thirty (30), sixty (60)[,] ninety (90) days, 6 months of employment or at any time per Manager's discretion and annually thereafter.

(AIF Employee Handbook, ECF No. 63-24, PageID.356.)  And with respect to discipline and counseling before termination, the handbook stated:

> The company may discipline or discharge an employee with or without cause and with or without notice.  However, the company believes in the concept of progressive discipline in appropriate circumstances.
>
> When the company elects progressive discipline, there will generally be a first and sometimes a second warning. . . .
>
> . . . This policy does not restrict in any way the company's right to terminate employment at-will, whether under this policy or outside it.

(*Id.*, PageID.357-358.)  Although Goldberg corrected Kovacevic's conduct on several occasions, he did not give her a formal performance review or warn her that she could be terminated due to her mistakes.

In *DeBoer v. Musahi Auto Parts, Inc.*, 124 F. App'x 387 (6th Cir. 2005), the Court of Appeals found sufficient evidence of pretext where, among other things, the employer did not counsel the plaintiff before terminating her, and the employer's handbook called for such counseling.  *Id.* at 394.  According to that court, "an employer's failure to follow a policy that is related to termination or demotion can constitute relevant evidence of pretext."  *Id.*

Similarly, in *Wadley v. National Railway Equipment Co.*, No. 5:20-cv-147 (TBR), 2021 WL 5405225 (W.D. Ky. Nov. 17, 2021), the court noted that "[w]hen a defendant terminates an employee for excessive absenteeism, a plaintiff can demonstrate pretext by providing evidence that it was his understanding that he would receive a formal warning that his conduct was perceived as being chronically late or absent."  *Id.* at *9.  There, the employer told the employee that his absences would not be an issue, giving him reason to believe that if circumstances changed, he would receive a warning about it.  *Id.*

Those cases are not binding on this Court. And they are not persuasive because they are distinguishable. Kovacevic does not point to evidence that AIF's policies required it to provide counseling or regular performance reviews before terminating her. To the contrary, its employee handbook stated that "the company *may* discipline or discharge an employee with or without cause or *without notice*." (AIF Employee Handbook, PageID.357 (emphasis added).) And with respect to performance reviews, the handbook stated that a supervisor can review an employee at periodic intervals "*or* at any time per [the] Manager's *discretion*." (*Id.*, PageID.356.) Thus, Goldberg had discretion about how and when to review her performance. In short, AIF's failure to counsel Kovacevic or to formally review her performance before terminating her did not violate its policies; thus, its conduct does not suggest pretext.

Kovacevic also points to Barber's praise of her, calling her the "best employee" because she was "always so happy at work." On its face, however, this statement refers to Kovacevic's mood rather than her job performance. Further, Kovacevic does not indicate *when* Barber made this statement. She has provided no evidence that Barber was aware of any of concerns about her performance when he made this statement. Indeed, he did not work directly with her like Goldberg did. If Barber made the statement before August 2020, with no knowledge of concerns about her work performance, his statement would have little, if any, relevance to the basis for Goldberg's decision. Thus, Barber's statement does not undermine AIF's asserted reason for its termination decision.

In summary, AIF is entitled to summary judgment for Kovacevic's claim under the EPSLA because AIF has provided a legitimate, nondiscriminatory reason for terminating her and she has not provided sufficient evidence from which a jury could reasonably infer that its reason was a pretext. Consequently, the Court will dismiss that claim with prejudice.

### B. CERA

According to the parties, no Michigan state court has considered a claim under the CERA. Because the Court will dismiss Kovacevic's federal claim, the Court will not exercise supplemental jurisdiction over her claim under state law. "'[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.'" *Burnett v. Griffith*, 33 F.4th 907, 915 (6th Cir. 2022) (quoting *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014)). That principle applies at the summary judgment stage. *See id.* Accordingly, the Court will dismiss the CERA claim without prejudice. *See* 28 U.S.C. § 1367(c)(3).

### V. CONCLUSION

The Court will grant AIF's motion insofar as it seeks summary judgment on the EPSLA claim. The Court declines to exercise supplemental jurisdiction over the CERA claim. Because there are no other pending claims, the Court will dismiss the case.

An order and judgment will enter consistent with this Opinion.

Dated: July 8, 2022            /s/ Hala Y. Jarbou
                               HALA Y. JARBOU
                               UNITED STATES DISTRICT JUDGE